UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| EDWARD JAMES LALIBERTE, | * * * | |
| Plaintiff, | * * | |
| v. | * * | Civil Action No. 21-cv-10651-ADB |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | * * * | |
| Defendant. | * * * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

Plaintiff Edward James Laliberte ("Mr. Laliberte") brings this action pursuant to Section

205(g) of the Social Security Act, 42 U.S.C. § 405(g), challenging the final decision of the

Commissioner of the Social Security Administration (the "Commissioner" or "Defendant")

denying his claim for Social Security Disability Insurance ("SSDI") benefits.  Before the Court

are Mr. Laliberte's motion for an order reversing the Commissioner's decision denying his

disability benefits, [ECF No. 22], and Defendant's motion to affirm the decision, [ECF No. 27].

For the following reasons, Mr. Laliberte's motion to reverse, [ECF No. 22], is <u>GRANTED</u> and

the Defendant's motion to affirm, [ECF No. 27], is <u>DENIED</u>.

I.      **BACKGROUND**

        A.      **Statutory and Regulatory Framework: Five-Step Process to Evaluate
                Disability Claims**

        "The Social Security Administration is the federal agency charged with administering

both the Social Security disability benefits program, which provides disability insurance for

covered workers, and the Supplemental Security Income program, which provides assistance for

1

the indigent aged and disabled."  <u>Seavey v. Barnhart</u>, 276 F.3d 1, 5 (1st Cir. 2001) (citing 42

U.S.C. §§ 423, 1381a).

The Social Security Act (the "Act") provides that an individual shall be considered

"disabled" if they are "unable to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death

or which has lasted or can be expected to last for a continuous period of not less than twelve

months."  42 U.S.C. § 1382c(a)(3)(A); <u>see also</u> 42 U.S.C. § 423(d)(1)(A).  The disability must be

severe, such that the claimant is unable to do his or her previous work or any other substantial

gainful activity that exists in the national economy.  <u>See</u> 42 U.S.C. § 1382c(a)(3)(B); 20 C.F.R.

§ 416.905.

When evaluating a disability claim under the Act, the Commissioner uses a five-step

process.  "All five steps are not applied to every applicant, as the determination may be

concluded at any step along the process."  <u>Seavey</u>, 276 F.3d at 5.  The First Circuit has explained

the process as follows:

> 1) if the applicant is engaged in substantial gainful work activity, the application is
> denied; 2) if the applicant does not have, or has not had within the relevant time
> period, a severe impairment or combination of impairments, the application is
> denied; 3) if the impairment meets the conditions for one of the "listed"
> impairments in the Social Security regulations, then the application is granted; 4) if
> the applicant's "residual functional capacity" is such that he or she can still perform
> past relevant work, then the application is denied; 5) if the applicant, given his or
> her residual functional capacity, education, work experience, and age, is unable to
> do any other work, the application is granted.

<u>Id.</u> (citing 20 C.F.R. § 416.920).

### B.       Procedural Background

Mr. Laliberte filed his application for SSDI benefits on October 23, 2018, and completed his application on December 7, 2018.  [R. 81, 159, 165].[1]  He alleged that he became disabled on October 24, 2015, when he fell at work while unloading a tractor-trailer, resulting in left tibia and fibula fractures treated with an ankle plate and nine screws, which cause pain in his left ankle and leg when sitting, standing, and walking.  [R. 52, 68–69, 83–84, 423].  He later amended his disability date to allege that his disability began on May 8, 2018.  [R. 49; ECF No. 1 ¶ 6].  Due to this injury, Mr. Laliberte stated that he can only walk about 20 minutes with the aid of a cane, has difficulty dressing, and is unable to do housework.  [R. 73].  He also alleged suffering from a learning disability, depression, and anxiety.  [R. 69, 83].

The Social Security Administration ("SSA") denied Mr. Laliberte's application for SSDI benefits on May 28, 2019.  [R. 79, 81].  Mr. Laliberte filed for reconsideration on August 13, 2019, alleging a new condition of insomnia caused by pain as of January 10, 2019.  [R. 83].  The SSA denied his application upon reconsideration on September 10, 2019.  [R. 92–93].  He then requested an administrative hearing, which took place on July 20, 2020.  [R. 43].  Mr. Laliberte, represented by counsel, testified at that hearing.  [R. 50–65].  On July 28, 2020, ALJ Jason A. Miller (hereafter, "the ALJ") found that Mr. Laliberte was not disabled, [R. 22–24], and on December 2, 2020, the SSA Appeals Council denied his Request for Review.  [R. 11–15].  Mr. Laliberte filed his complaint with this Court on April 19, 2021, seeking review of the Commissioner's final decision pursuant to Section 205(g) of the Act.  [ECF No. 1].  After this

---

[1] References to pages in the Administrative Record, which was filed electronically as ECF No. 17, are cited as "[R. __]."

Court granted an extension of time to file an answer, the Commissioner filed its response to the complaint on October 13, 2021.  [ECF No. 16].

### C.      Relevant Work and Medical History

Mr. Laliberte was born on May 8, 1968, and was 50 years old at the time of his initial application for SSDI benefits in 2018.  [R. 50].  He has an eighth-grade education.  [R. 51]. From 1986 until the time of his injury in 2015, he had worked with some consistency, though he also had gaps of up to 16 months between jobs.  [R. 78].  During that time, he worked as a die stamper, a pipe tester, an auto dismantler, and, most recently, a laborer.  [R. 78].  He has not worked since the time of his injury.  [R. 52].

### 1.      Dr. O'Brien

The injury occurred in October 2015, when, at the age of 47, [R. 522], Mr. Laliberte fell at work while loading lumber into a truck and was subsequently diagnosed with tibia and fibula fractures to his left ankle.  [R. 527, 611].  He was evaluated by Dr. Todd O'Brien at North Shore Medical Center on the day of the injury.  [R. 497, 522–24].  Five days later, on October 29, 2015, Dr. O'Brien performed an open reduction internal fixation ("ORIF") surgery for the fracture at Massachusetts General Hospital.  [R. 425, 495, 611].  Mr. Laliberte had post-operative visits with Dr. O'Brien at New England Orthopedic Specialists, LLC from November 11, 2015 through at least October 24, 2016.  [R. 600–18].  Over the course of those visits, he had redness, swelling, and tenderness in his ankle, but was not found to have more serious complications, such as deep vein thrombosis.  [R. 526, 600–09].

Mr. Laliberte also developed postoperative complex regional pain syndrome.  [R. 611]. He began physical therapy with "good result" in December 2015.  [R. 289, 611].  He attended regular physical therapy visits for about three months and then took less than two months off of

physical therapy while waiting for an insurance reapproval, during which time his pain increased significantly. [R. 335–419, 611]. He restarted therapy in May 2016 following his therapist's petition for more visits. [R. 289, 335, 611]. His last physical therapy visit was June 9, 2016. [R. 289–96].

In October 2016, Dr. O'Brien reported that Mr. Laliberte's fracture was well-healed and that he had improved significantly, but still described him as "temporarily totally disabled from the essential aspects of his job[.]" [R. 617–18]. Dr. O'Brien also recommended removing the hardware placed during surgery because Mr. Laliberte's pain was persisting. [Id.]. Mr. Laliberte had a pre-operative visit to discuss removing the hardware with Dr. O'Brien on January 27, 2017. [R. 619–20]. The record does not show, however, that it was ever removed. [R. 31].

2.   Dr. Do

Mr. Laliberte received care from Dr. Do at New England Comprehensive Foot and Ankle Group LLC, from March 22, 2017 to June 8, 2017, for left ankle joint pain and stiffness, as well as scarring of the muscle of the lower extremity. [R. 576–85]. On May 15, 2017, Dr. Do noted that she "consider[ed] [Mr. Laliberte] permanently disabled" and that she did not think that further physical therapy would help. [R. 585]. At some of his visits with Dr. Do, including on May 2 and 25, 2017, Mr. Laliberte received dexamethasone and lidocaine injections to his ankle, which, at his last visit on June 8, 2017, Dr. Do noted provided Mr. Laliberte only temporary relief. [R. 580–82, 587]. At these visits he was also given ankle exercises to do at home. [R. 582, 585, 587].

3.   Consultative Examinations and Evaluations of Disability by State Agency Consultants

Mr. Laliberte's physical, mental, and behavioral health was evaluated by the Massachusetts Rehabilitation Commission Disability Determination Services through two

5

consultative examinations ("CEs") and multiple evaluations of the record evidence by medical and psychological experts, as part of their determination of his SSDI eligibility. [R. 537–46].

Dr. Yacov Kogan performed an internal medicine CE on May 21, 2019, finding that Mr. Laliberte suffered from no range of motion deficits or neurological deficits that limited "sitting, standing, walking, bending, lifting, carrying, reaching or finger manipulations[,]" and that work activities relating to those activities were mildly limited due to pain symptoms. [R. 44, 542]. On May 28, 2019, as part of the initial determination of Mr. Laliberte's eligibility for benefits, Dr. S. Ram Upadhyay, a state agency medical consultant, reviewed the medical evidence, including Dr. Kogan's CE, and found "no evidence of severe current medical impairment." [R. 34, 68, 73]. On September 10, 2019, as part of the reconsideration of Mr. Laliberte's benefits, [R. 82], Dr. Swaran Goswami, another state agency medical consultant, reviewed the same evidence. [R. 34]. Upon his review of the medical evidence, Dr. Goswami found that Mr. Laliberte still suffered from complex regional pain syndrome but that the exam was "essentially within normal limits," and he did not have a severe combination of impairments. [R. 88–89].

Stanley Rusnak, Jr., Ed.D., performed a behavioral and psychological CE on May 7, 2019, and found that Mr. Laliberte was "moderately depressed and anxious," which "appear[ed] to be longstanding and, more recently, a result of not being able to do laborer's work due to his injury." [R. 537–40]. Dr. Rusnak's "diagnostic impression" was that Mr. Laliberte had adjustment disorder with depressed mood, as well as a moderate learning disorder in math, and noted that Mr. Laliberte "would most likely benefit from supportive counseling [and] psychotropic medication." [R. 540]. As part of the initial determination of Mr. Laliberte's eligibility for benefits, [R. 68], on May 14, 2019, Dr. Robert Lasky, a state agency psychological consultant, evaluated the mental and behavioral health evidence, including Dr. Rusnak's CE, and

found mild limitation in two paragraph B criteria functional areas (ability to understand, remember, or apply information and ability to adapt or manage oneself) and moderate limitation in the two other functional areas (ability to interact with others and ability to concentrate, persist, or maintain pace).  [R. 35, 74].  When his eligibility was later being reconsidered, [R. 82], on August 30, 2019, Dr. Russell Phillips, another state agency psychological consultant, also evaluated the evidence, and found mild limitation in all four functional areas and "no evidence of any sustained severe mental impairment."  [R. 35, 89–90].

4.    Emergency Room Record

Finally, Mr. Laliberte's most recent medical record is from May 2, 2020, when he went to the emergency room complaining of chronic left ankle pain that had increased "over the past few months."  [R. 552].  Per the nursing report from Elsa Wright, RN, he "ha[d] not called [his primary care provider] or foot surgeon about pain" and "ambulate[d] without difficulty."  [R. 553].  The exam of his ankle was "[u]nremarkable" with no signs of infection, fracture, lesion, or other abnormality.  [R. 557–58].  On discharge he was advised to follow up with Dr. O'Brien and was given information for an ankle specialist to get a third opinion regarding potential removal of the hardware, though it is not clear from the record if he ever met with the ankle specialist.  [R. 557].

D.    **The July 2020 Hearing**

On July 20, 2020, the ALJ conducted a virtual hearing at which Mr. Laliberte, his counsel, and vocational expert Mary Vasishth (the "VE") appeared.  [R. 42–67].  Mr. Laliberte testified, answering questions from both the ALJ and his counsel.  [R. 50–64].  The ALJ determined that he did not require the testimony of the VE and dismissed her after Mr. Laliberte's testimony.  [R. 64].

Mr. Laliberte testified that he had surgery on his ankle following his accident, after which he used crutches for three or four months, and then subsequently started using a cane, which he still uses.  [R. 52–53].  When asked about medical conditions he was currently being treated or taking medication for, Mr. Laliberte only described pain in his ankle, leg, and back, the last of which he had not seen a doctor for.  [R. 55].  He later clarified that he also suffers from depression and anxiety but has not sought treatment because he was embarrassed.  [R. 62].  Mr. Laliberte stated that he feels moderate pain (a five out of ten) every day of the week throughout all waking hours.  [R. 60].  Though he was prescribed Oxycodone for his ankle pain, he testified that he took it after the surgery but no longer takes it because he did not like the way he felt on it, [R. 59–60], and did not "want to get hooked on the medication."  [R. 59].  He stated that he follows all his doctor's orders to try and reduce his pain, including about 40 minutes of physical therapy a day.  [R. 56, 60–61].

Mr. Laliberte said that he has no present source of income and is "basically homeless." [R. 51].  At the time of his appearance before the ALJ he was living in Lynn, Massachusetts with a roommate, but did not have stable housing.  [R. 50–51].

He testified that he last worked when he got injured in 2015, and that since at least 2018 he has also not done any volunteering or odd jobs.  [R. 51–52, 63].  He stated that he can sit still in a chair for no more than 25 minutes and can stand for no more than 20 minutes due to the pain in his ankle.  [R. 61–62].  He testified that he cannot cook, but that he can and does prepare his own meals by making "a fast sandwich" or "put[ting] soup inside the microwave."  [R. 56].  He said that he cannot do his own laundry or grocery shopping or take public transportation because bending down to get things and standing in lines causes pain in his left leg.  [R. 56–58, 64].  He said that he has tried to get a driver's license but has failed the written portion of the exam

multiple times, [R. 51, 58–59], which he attributes to his inability to "focus and function," [R. 59].

### E.      The ALJ's Decision

On July 28, 2020, the ALJ found that Mr. Laliberte was not disabled under Sections 216(i), 223(d), and 1614(a)(3)(A) of the Act.  [R. 22, 26].  As a threshold matter, the ALJ found that Mr. Laliberte met the insured status requirements of the Act through June 30, 2019.  [R. 28]; see 42 U.S.C. § 416(i)(3).  The ALJ proceeded to conduct the five-step sequential evaluation process for determining whether an individual is disabled.  [R. 27–28]; see Seavey, 276 F.3d at 5.  At Step 1, the ALJ determined that Mr. Laliberte "ha[d] not engaged in substantial gainful activity since October 24, 2015, the alleged onset date."  [R. 28 (citations omitted)].

As to the analysis required at Step 2, the ALJ explained that he must determine "whether the claimant has a medically determinable impairment that is 'severe' or a combination of impairments that is 'severe[.]'"  [R. 27 (citing 20 C.F.R. §§ 404.1520(c), 416.920(c))].  "An impairment or combination of impairments is 'severe' within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities[]" and "[a]n impairment or combination of impairments is 'not severe' when medical and other evidence establish only a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work."  [R. 27 (citing 20 C.F.R. §§ 404.1522, 416.922; SSR 85-28, 1985 WL 56856 (Jan. 1, 1985) ("SSR 85-28"); SSR 16-3p, 2017 WL 5180304 (Oct. 25, 2017) ("SSR 16-3p"))].  Finally, to qualify as a disability, "the claimant's disabling limitations must persist for a continuous period of at least 12 months."  [R. 30 (citing 20 C.F.R. §§ 404.1509, 416.909)].

The ALJ conducted this analysis in two parts, first evaluating whether there was an underlying medically determinable physical or mental impairment, or combination of impairments, that could reasonably be expected to produce Mr. Laliberte's symptoms, and second evaluating the "intensity, persistence, and limiting effects" of the symptoms to determine the extent to which they limited his ability to work.  [R. 29].

In the first part of this analysis, the ALJ determined that Mr. Laliberte had several medically determinable impairments: "[s]tatus-post fracture of the left ankle, post ORIF surgery, with resolved complex regional pain syndrome and scar tissue; adjustment disorder with depressed mood; and learning disorder."  [R. 28 (citations omitted)].  He explained that "[t]hese impairments are medically determinable because they have been clinically diagnosed by acceptable medical sources, on the basis of examination findings and laboratory testing results." [R. 28].  Specifically, he found that Mr. Laliberte's "orthopedic impairments[,]" his "diagnosis of complex regional pain syndrome[,]" and his "issues involving scar tissue" were all documented in treatment records from medical providers, including both physicians and physical therapists. [R. 28].  Additionally, the ALJ noted that "[a]lthough [Mr. Laliberte has not received] psychiatric treatment of his own, the above mental health impairments were noted by a psychological consultative examiner[.]"  [R. 28].  Conversely, the ALJ determined Mr. Laliberte's back pain was not medically determinable because "there [was] no objective clinical or diagnostic evidence to support [his] allegation of back pain."  [R. 28].

The ALJ did not discuss whether Mr. Laliberte's purported anxiety or difficulty sleeping were medically determinable impairments, but later in the decision noted that "the claimant alleged depression, anxiety, and difficulty sleeping, in his original application[,]" "[h]owever,

hearing testimony confirms that he has not received any outpatient treatment for these conditions, and that he does not take any medications relevant to psychiatric disorders." [R. 34].

In the second part of the analysis, the ALJ found that Mr. Laliberte's medically determinable impairments, either individually or in combination, did not "significantly limit[] ([and] [were not] expected to significantly limit) [his] ability to perform basic work-related activities for 12 consecutive months[.]" [R. 29]. To reach this conclusion, the ALJ looked at evidence related to the "intensity, persistence and limiting effects" of his impairments. [R. 32]. As to Mr. Laliberte's physical impairments, the ALJ discussed various pieces of evidence, including that his podiatrist Dr. Do noted no physical abnormalities other than scar tissue and recommended only "the most conservative of treatment measures," [R. 33]; that internal medicine consultative examiner Dr. Kogan stated that he would have "no more than mild work-related limitations," [R. 34]; his lack of a "clear longitudinal history of complaints of particular frequency or intensity"; and his lack of outpatient care after June 2017, [R. 33]. The ALJ noted that Mr. Laliberte had testified to a "limited capacity to sit, stand, and walk," "that he requires a cane for ambulation[,]" and that "[h]e is unable to do more strenuous household chores such as grocery shopping or laundry, or cooking or preparing more than simple meals" but ultimately concluded this was inconsistent with the objective medical evidence. [R. 33].

Regarding his mental and behavioral health impairments—specifically adjustment disorder with depressed mood and a learning disorder—for which Mr. Laliberte had not previously been treated, the ALJ considered the CE performed by Dr. Rusnak on May 7, 2019, and the evaluations of record evidence by Dr. Lasky on May 14, 2019, and by Dr. Phillips on August 30, 2019. [R. 34–35, 73–80, 89–92, 537–40]. The ALJ explained that "[b]ecause the claimant has medically determinable mental impairments," he would "consider[] the four broad

functional areas, set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments . . .  known as the 'paragraph B' criteria."  [R. 35]. He described the four functional areas as: "understanding, remembering or applying information[,]" "interacting with others[,]" "concentrating, persisting or maintaining pace[,]" and "concentrating, persisting or maintaining pace."  [R. 35].

The ALJ noted that Mr. Laliberte was diagnosed by Dr. Rusnak with adjustment disorder with depressed mood, as well as a moderate learning disorder in math, but ruled out post-traumatic stress disorder (PTSD).  [R. 35].  Further, he cited Dr. Phillips conclusion that Mr. Laliberte had only mild limitation in each of the paragraph B functional areas.  [R. 35].  The ALJ found that Dr. Phillips' evaluation was persuasive because

> as a state agency psychological consultant, he is deemed to be an expert for the purposes of medical record review, and knowledge of disability program rules.  His opinion is consistent with the record as a whole, and . . . even at the hearing level, after the date of his opinion, there is no evidence of psychiatric treatment or medication.

[R. 35].

He also noted that Dr. Lasky had previously found that Mr. Laliberte had mild limitations in two areas and moderate limitations in two areas, but that this evidence was less persuasive than Dr. Phillips' evaluation because it was less consistent with the record as a whole and had been superseded by Dr. Phillips' evaluation.  [R. 35].  The ALJ also concluded that Dr. Rusnak's "diagnosis of learning disorder" "does not appear to be vocationally relevant, because the claimant did accumulate a long work history even after finishing with school."  [R. 35].

Based on this evidence, the ALJ found that while Mr. Laliberte's "medically determinable impairments could reasonably be expected to produce [his] alleged symptoms[,]" Mr. Laliberte's "statements concerning the intensity, persistence and limiting effects of these

symptoms are not entirely consistent" with the record evidence.  [R. 32].  With regards to

Plaintiff's physical impairments, the ALJ explained that the objective evidence "suggest[ed] that

the claimant's injury healed within 12 months of the alleged onset date, and that there [were] no

abnormal clinical findings after October 2016 to suggest an ongoing degree of severity to this

impairment."  [R. 32].  As to his mental impairments, the ALJ found that the objective evidence

showed no more than mild limitation in any of the functional areas and did not otherwise indicate

more than a minimal limitation on his ability to do basic work activities.  [R. 35].

The ALJ explained that to be "under a disability for [SSDI,]" a "claimant's disabling

limitations must persist for a continuous period of at least 12 months[,]" but that in this case "the

objective evidence show[ed] significant objective improvement during the 12-month period

following the date of the injury[.]"  [R. 30].  Thus, he concluded that Mr. Laliberte "has not been

under a disability, as defined in [the Act], from October 24, 2015" through the date of his

decision.  [R. 36].

## II.     STANDARD OF REVIEW

This Court has jurisdiction pursuant to Section 205(g) of the Act, 42 U.S.C. § 405(g).

Section 205(g) provides that an individual may obtain judicial review of a final decision of the

Commissioner by instituting a civil action in federal district court.  See 42 U.S.C. § 405(g).

Under sentence four of Section 205(g), the Court has the power "to enter, upon the pleadings and

transcript of the record, a judgment affirming, modifying, or reversing the decision of the

Commissioner . . . with or without remanding the cause for a rehearing."  Id.  A court's decision

under this provision, however, can be based only on a review of the administrative record of

proceedings before the Commissioner.  See Whitzell v. Astrue, 792 F. Supp. 2d 143, 147 (D.

Mass. 2011) (citing 42 U.S.C. § 405(g)).

Under Section 205(g), this Court's review of the Commissioner's decision is "limited to determining whether the ALJ used the proper legal standards and found facts upon the proper quantum of evidence."  Ward v. Comm'r of Soc. Sec., 211 F.3d 652, 655 (1st Cir. 2000).  The Court must defer to the Commissioner's factual findings, so long as such findings are "supported by substantial evidence," but the Court's review of the Commissioner's conclusions of law is *de novo*.  Id.; see also Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) ("The ALJ's findings of fact are conclusive when supported by substantial evidence . . . but are not conclusive when derived by ignoring evidence, misapplying the law, or judging matters entrusted to experts.").

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficien[t] evidence to support the agency's factual determinations. And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is more than a mere scintilla.  It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019) (alteration in original) (internal quotation marks and citations omitted).  In general, the Court "must affirm the [Commissioner's] resolution, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  Rodriguez Pagan v. Sec'y of Health & Hum. Servs., 819 F.2d 1, 3 (1st Cir. 1987) (citing Lizotte v. Sec'y of Health & Hum. Servs., 654 F.2d 127, 128 (1st Cir. 1981)); see also Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018).

That said, courts have applied a more exacting standard to ALJs' denial of benefits at Step 2 of the five-step sequential analysis.  If "a finding [of non-severity] is not clearly established by medical evidence . . . *adjudication must continue through the sequential evaluation process*."  Teves v. McMahon, 472 F. Supp. 2d 82, 86 (D. Mass. 2007) (second omission and emphasis in original); see also McCrea v. Comm'r of Soc. Sec., 370 F.3d 357, 360

(3d Cir. 2004) ("Any doubt as to whether this showing has been made is to be resolved in favor

of the applicant.").  "[A]n error at Step Two will result in reversible error . . . if the ALJ

concluded the decision at Step Two, finding no severe impairment."  Syms v. Astrue, No. 10-cv-

00499, 2011 WL 4017870, at *1 (D.N.H. Sept. 8, 2011).

## III.     DISCUSSION

Mr. Laliberte makes two categories of arguments as to why the ALJ's decision should be

reversed and remanded.  First, Mr. Laliberte argues that the ALJ failed to properly consider

certain record evidence and failed to evaluate whether several of Mr. Laliberte's medical

conditions were medically determinable.  [ECF No. 22 at 1–2].  Second, after determining Mr.

Laliberte did not have a severe impairment, Mr. Laliberte argues that the ALJ improperly

stopped the evaluation of his disability at Step 2, rather than proceeding through Step 5, because

the non-severity of his impairments was not clearly established.  [Id.].[2]  The Commissioner

responds that there is substantial evidence in the record supporting the ALJ's finding of non-

severity, and that none of the purported issues raised by Mr. Laliberte constitute reversible

errors.  [ECF No. 28 at 16–21].  Mr. Laliberte's first category of arguments is unavailing, but the

---

[2] Mr. Laliberte raises several additional arguments in his brief: that "[t]he SSA Commissioner at
the time of the hearing was not validly appointed based on recent Supreme Court caselaw, and
thus the ALJ was not validly appointed to render a decision[]" and "[t]he Appeals Council
abused its discretion and violated the law by not reopening the case."  [ECF No. 22 at 1].  The
Court understands,  however that Mr. Laliberte has abandoned those arguments.  See [ECF No.
42 at 4].

Court agrees with his position on the second such that reversal and remand for further proceedings on this basis is warranted.

### A.      The ALJ's Decision to Stop the Evaluation Process at Step 2

The five-step process provides that "[a]ll five steps are not applied to every applicant, as the determination may be concluded at any step along the process." Seavey, 276 F.3d at 5.  The Step 2 severity requirement is generally a *de minimis* standard, intended to "do no more than screen out groundless claims." McDonald v. Sec'y of Health & Hum. Servs., 795 F.2d 1118, 1124 (1st Cir. 1986).  "[B]ecause SSR 85-28 requires a finding of non-severity to be 'clearly established by medical evidence,' a denial at step two is inappropriate where the record evidence 'might be amenable to more than one interpretation' or 'the medical evidence is equivocal.'"  Brand v. Berryhill, No. 17-cv-01203, 2019 WL 1055628, at *6 (D.N.M. Mar. 6, 2019) (quoting Gosch v. Astrue, No.  09-cv-1349, 2011 WL 1899289, at *6 (D. Kan. May 19, 2011)).  The Court finds that although the ALJ's determination of non-severity is supported by the record, termination of his review at Step 2 was nevertheless inappropriate because the evidence could also support a finding that Mr. Laliberte's mental impairments or combination of impairments "significantly limit[ed] [his] ability to perform basic work activities," Purdy, 887 F.3d at 10–11 (citing 20 C.F.R. § 416.922).

As noted above, there is substantial evidence supporting the ALJ's non-severity determination.  Regarding his ankle injury, the objective medical evidence, including minimal follow-up treatment and clinical examination findings all within normal limits, support a finding that the injury healed within 12 months, and is therefore by itself not severe within the meaning of the SSA regulations.  More recent physical evaluations confirm that any continuing limitations to Mr. Laliberte's ability to perform basic work activities are minimal.  Additionally, given the

ALJ's evaluation of its relative persuasiveness, the psychological evidence can support the finding that Mr. Laliberte had several mental impairments, but that these impairments only caused Mr. Laliberte mild limitations in the four paragraph B functional areas and no more than minimal work-related limitations.  To the extent there were conflicting medical opinions in the record, the Court finds that the ALJ adequately addressed and weighed their relative persuasiveness.

On the other hand, the Court finds that the record also contains uncertainty about the potential effects of his impairments or combination of impairments on his ability to perform basic work activities, such that it could support an opposing conclusion.  See Durant v. Chater, 906 F. Supp. 706, 711 (D. Mass. 1995) (citing McDonald, 795 F.2d at 1125).  As the ALJ noted, Dr. Rusnak concluded that Mr. Laliberte suffered from adjustment disorder with depressed mood and a moderate learning disorder in math.  [R. 540].  While the ALJ found that Mr. Laliberte's moderate learning disability "does not appear to be vocationally relevant, because the claimant did accumulate a long work history even after finishing with school[,]" [R. 35], a plausible alternative conclusion could be that Mr. Laliberte's learning disability, along with his other medically determinable impairments, could impose significant limitations on basic work activities and therefore be severe.  See, e.g., Perry v. Astrue, No. 11-cv-40215, 2014 WL 4965910, at *3 (D. Mass. Sept. 30, 2014) ("At step two, the ALJ found that Plaintiff had severe impairments of a bipolar disorder; a learning disability; and attention deficit hyperactivity disorder ('ADHD')[.]"); Michael K. v. Kijakazi, No. 20-cv-541, 2022 WL 43497, at *1 (D.R.I. Jan. 5, 2022), report and recommendation adopted, No. 12-cv-00541, 2022 WL 1459556 (D.R.I. Feb. 2, 2022) (explaining that ALJ "agreed that anxiety, depression, ADHD and 'learning disorder-math' are severe impairments at Step Two"); Roxauna M. v. Berryhill, No. 17-cv-

00350, 2018 WL 3493075, at *1 (D. Me. July 20, 2018), aff'd, No. 17-cv-00350, 2018 WL

4016432 (D. Me. Aug. 22, 2018) ("[T]he ALJ found, in relevant part, that, since attaining age 18,

the plaintiff had the severe impairments of [ADHD], learning disability, depressive disorder, and

general anxiety disorder . . . .").

Additionally, while one state agency psychological consultant found Mr. Laliberte had

only minimal limitations in each of the four paragraph B functional areas, the other found Mr.

Laliberte had moderate limitations in two of the four functional areas ([1] ability to interact with

others and [2] ability to concentrate, persist, or maintain pace).  The ALJ explained that he found

the first state agency psychological consultant's evaluation more persuasive than the second, but

that "is not equivalent to a conclusion that is 'clearly established by medical evidence,' as

required by SSR 85-28."  Sanchez v. Berryhill, No. 17-cv-00543, 2018 WL 1870434, at *4

(D.N.M. Apr. 17, 2018).  Where ALJs have previously found similar impairments to be severe

and two state agency psychological consultants evaluating the same evidence, just several

months apart, have reached differing conclusions about the degree of Mr. Laliberte's limitations,

the Court finds that "the record evidence 'might be amenable to more than one interpretation' or

'the medical evidence is equivocal.'"  Brand, 2019 WL 1055628, at *6 (quoting Gosch, 2011

WL 1899289, at *6).  The Court therefore concludes that the medical evidence does not "clearly

establish" a finding of non-severity, and that the ALJ therefore erred by not continuing the

evaluation process past Step 2.  Accordingly, the Commissioner's decision is REVERSED, and

the case will be REMANDED for further proceedings consistent with this Order.

**B.      Evaluation of Severity at Step 2**

The Court will briefly address Mr. Laliberte's other arguments.

        1.      <u>Not Considering Certain Impairments in the Severity Analysis</u>

Mr. Laliberte contends that the ALJ improperly failed to evaluate his anxiety and difficulty sleeping in finding that he did not have a severe impairment or combination of impairments.  [ECF No. 22 at 5].  "Under SSR 16-3p, the SSA 'must have objective medical evidence from an acceptable medical source to establish the existence of a medically determinable impairment that could reasonably be expected to produce an individual's alleged symptoms.'"  <u>Stevenson v. Saul</u>, No. 19-cv-11202, 2020 WL 5821612, at *8 (D. Mass. Sept. 30, 2020) (quoting SSR 16-3p).  "Objective medical evidence is medical signs, laboratory findings, or both," 20 C.F.R. § 404.1513, where "medical signs" include, as relevant here, "medically demonstrable phenomena that indicate specific psychological abnormalities, *e.g.*, abnormalities of behavior, mood, thought, memory, orientation, development, or perception, and must also be shown by observable facts that can be medically described and evaluated[,]" <u>id.</u> § 404.1502. "Acceptable medical sources" include physicians, psychologists, and other medical providers. <u>Id.</u>  "The SSA 'will not use [a claimant's] statement of symptoms, a diagnosis, or a medical opinion to establish the existence of an impairment(s).'"  <u>Stevenson</u>, 2020 WL 5821612, at *8 (alteration in original) (quoting 20 C.F.R. § 416.921).

As the ALJ noted, Mr. Laliberte testified "that he has not received any outpatient treatment for these conditions, and that he does not take any medications relevant to psychiatric disorders[]."  [R. 34].  Additionally, unlike Mr. Laliberte's other mental impairments, anxiety and difficulty sleeping were not established in Dr. Rusnak's CE.  Dr. Rusnak noted that Mr. Laliberte's "behavior was . . .  somewhat anxious and nervous[,]" [R. 538], and that he "appeared

to be moderately depressed and anxious," [R. 540], but did not indicate that he should be diagnosed with anxiety.  The Court therefore finds that because Mr. Laliberte failed to present objective medical evidence of these impairments, the ALJ properly excluded them from the severity analysis.

        2.     <u>Statements of Drs. Do and O'Brien</u>

Mr. Laliberte also argues that the ALJ improperly disregarded various specific statements made by his treating physicians, Drs. O'Brien and Do, including:

- On October 24, 2016, under "Work Status[,]" Dr. O'Brien noted, "[h]e remains temporarily totally disabled from the essential aspects of his job at the time of injury." [ECF No. 22 at 12 (quoting R. 477)].

- Also on October 24, 2016, "Dr. O'Brien note[d] a positive Tinel's[], . . . [and] 'less significant soft tissue findings in terms of shiny appearance of skin and tenderness to palpitation.'" [<u>Id.</u> at 13 (quoting R. 476)].

- On May 15, 2017, Dr. Do indicated that "[t]he inability to invert and evert the foot have now caused excessive strain to the ankle ligaments, thus causing pain when the foot rests on the ground and when the patient walks.  Due to the continued pain and lack of motion, I consider this patient permanently disabled . . . I don't feel that further Physical therapy will help." [<u>Id.</u> at 11 (quoting R. 585)].

- "Dr. Do directly opin[ed] that Mr. Laliberte is '. . . totally disabled from gainful employment.'" [<u>Id.</u> at 12 (quoting R. 647)].

Mr. Laliberte correctly concedes that the ALJ is not required to "provide any analysis about how [the ALJ] considered," 20 C.F.R. § 404.1520b(c), the physicians' statements that Mr. Laliberte is disabled and/or unable to perform his job, <u>see id.</u> ("[Because] [s]tatements that [a claimant is] or [is] not disabled, blind, able to work, or able to perform regular or continuing work" are "inherently neither valuable nor persuasive to the issue of whether [a claimant is] disabled or blind under the Act, [ALJs] will not provide any analysis about how [they] considered such evidence in [their] determination or decision, even under § 404.1520c"). Nevertheless, he argues it was inappropriate for the ALJ to not consider them or other "non-

conclusory" statements and statements related to "non-vocational limitations" since they are instructive in providing context for each provider's characterizations of Mr. Laliberte's physical limitations and level of pain.  [ECF No. 22 at 11].  This argument is flawed for several reasons.

First, to the extent Mr. Laliberte is arguing the ALJ did not consider these statements because the ALJ did not discuss them, as the Commissioner correctly points out, the ALJ "is not required to—nor could he reasonably—discuss every piece of evidence in the record.  Indeed, [a]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party." Johnson v. Colvin, 204 F. Supp. 3d 396, 409 (D. Mass. 2016) (citation and internal quotation marks omitted) (alteration in original); Miller ex rel. K.M. v. Astrue, No. 09-cv-12018, 2011 WL 2462473, at *11 (D. Mass. June 16, 2011) ("The failure to mention a particular record does not evince a failure to consider it.  To the contrary, the presumption is that the ALJ has considered all of the evidence before him." (citation and internal quotation marks omitted)).

Second, to the extent that Mr. Laliberte is arguing these are "medical opinions," which would require the ALJ to "evaluate[] the relative persuasiveness of [them]. . . in terms of five specified factors" and "discuss application of the supportability and consistency factors in the written decision[,]" Richardson v. Saul, 565 F. Supp. 3d 154, 167 (D.N.H. 2021) (citing 20 C.F.R § 404.1520c), the Court finds they largely are not.  "Medical opinion" is defined as a:

> [S]tatement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the following abilities: . . .
>
> (i) Your ability to perform physical demands of work activities, such as sitting, standing, walking, lifting, carrying, pushing, pulling, or other physical functions (including manipulative or postural functions, such as reaching, handling, stooping, or crouching);
> (ii) Your ability to perform mental demands of work activities, such as understanding; remembering; maintaining concentration, persistence, or pace;

carrying out instructions; or responding appropriately to supervision, co-workers, or work pressures in a work setting;

(iii) Your ability to perform other demands of work, such as seeing, hearing, or using other senses; and

(iv) Your ability to adapt to environmental conditions, such as temperature extremes or fumes.

20 C.F.R. § 404.1513(a)(2).

"Other medical evidence," meanwhile, is defined as "evidence from a medical source that is not objective medical evidence or a medical opinion, including judgments about the nature and severity of . . . impairments, . . . medical history, clinical findings, diagnosis, treatment prescribed with response, or prognosis." 20 C.F.R. § 416.913(a)(3); see Lisa A. S. v. Kijakazi, No. 21-cv-00078, 2022 WL 4494189, at *2 (N.D.N.Y. Sept. 28, 2022) ("The [current] regulations have removed 'judgments about the nature and severity of your impairments' as well as 'diagnosis' and 'prognosis' from the definition of 'medical opinions' and placed them in the definition of 'other medical evidence.'" (quoting 20 C.F.R. §§ 404.1513(a)(3), 416.913(a)(3))).

The only statement the Court finds could be a medical opinion is Dr. Do's statement that the "[t]he inability to invert and evert the foot have now caused excessive strain to the ankle ligaments, thus causing pain when the foot rests on the ground and when the patient walks." [ECF No. 22 at 11 (quoting R. 585)]. The Commissioner argues that this is not a medical opinion because "Dr. Do did not state that pain caused restrictions or identify what Plaintiff could do despite pain," [ECF No. 28 at 20 (citing R. 585; 20 C.F.R. § 404.1513(a)(2); Rosado v. Kijakazi, No. 20-cv-30124, 2021 WL 5567397, at *9 (D. Mass. Nov. 29, 2021); Tuttle v. Saul, No. 20-cv-30064, 2021 WL 2018990, at *18 (D. Mass. May 20, 2021))], and that even if the Court finds that it is a medical opinion, "Dr. Do certainly did not state that Plaintiff had *significant* limitations on his ability to walk or do any other work-related activity[,]" [id.]. The Court finds that this likely is a medical opinion, but that the ALJ did not err in not specifically

referencing it because he did discuss Dr. Do's treatment records and medical opinions more generally.  See, e.g., [R. 31, 33]; see also Richardson v. Saul, 565 F. Supp. 3d 154, 167 (D.N.H. 2021) ("[W]here a single medical professional offers multiple opinions, the ALJ is not required to discuss each opinion individually, but instead may address all of the professional's opinions 'together in a single analysis.'" (quoting 20 C.F.R. § 404.1520c(b)(1))).

Third, to the extent that Mr. Laliberte is arguing that Dr. O'Brien's reference to the "Tinel" test is "objective medical evidence" that the ALJ was required to consider, again, the fact that the ALJ did not discuss it does not mean he did not review it.  Miller, 2011 WL 2462473, at *11.

Finally, if Mr. Laliberte takes issue with the relative weight assigned by the ALJ to any of these statements, "[w]eighing conflicting evidence . . . is the task of the ALJ, not the reviewing court[.]"  Hutchins v. Astrue, No. 09-cv-10900, 2010 WL 3895183, at *4 (D. Mass. Sept. 30, 2010).  So long as an ALJ "clearly states the grounds on which he relied" in reaching a conclusion, the Court must defer to those conclusions.  Id. (citing Larlee v. Astrue, 694 F. Supp. 2d 80, 84 (D. Mass. 2010)).  Here, the ALJ provided an extended discussion of the grounds for his severity determination and how he evaluated conflicting evidence, including the treatment records of Drs. Do and O'Brien, as to Mr. Laliberte's ankle.  See [R. 30–33].  In fact, the ALJ based his decision in no small part on Dr. Do's findings of no abnormalities and her recommendation for a conservative course of treatment, on Dr. O'Brien's findings of significant improvement, and on Mr. Laliberte's lack of continued care with either of these providers after mid-2017.  [R. 33].  For all of the above reasons, the Court finds that the ALJ properly considered the opinions of these two providers and declines to reverse the ALJ's decision on this basis.

3.      Dr. Rusnak's CE

Mr. Laliberte further alleges that the ALJ failed to properly consider Dr. Rusnak's statement in his psychological CE that Mr. Laliberte "may benefit from psychotropic drugs and psychotherapy for his disorder."  [ECF No. 22 at 14 (citing R. 540)].  Mr. Laliberte argues no reasonable person can deny that this statement shows his mental impairments meet the *de minimis* severity standard.  [Id. at 14].  Again, because this statement does not appear to be a medical opinion, see 20 C.F.R. § 404.1513(a)(2), the ALJ was not required to discuss it.  The Court also declines to adopt what would amount to a categorical rule that anyone with a mental health diagnosis resulting in a referral to supportive counseling or prescribed medication would be found to have a "severe" impairment.  Additionally, Dr. Rusnak stated that Mr. Laliberte "had fair capacities to handle stress, carry out and remember instructions, respond to supervision or coworkers, and respond to work pressures," which the ALJ found to be consistent with the record and to "not support more than minimal work-related limitations."  [R. 35].  Ultimately, while the ALJ may not have construed this statement the way Mr. Laliberte would have, that does not mean that ALJ failed to properly consider it.[3]

IV.      **CONCLUSION**

Accordingly, for the reasons stated above, Mr. Laliberte's motion to reverse, [ECF No. 22], is GRANTED and the Commissioner's motion to affirm, [ECF No. 27], is DENIED.  The

---

[3] In his reply brief, Mr. Laliberte argues that "this Court [should] consider it a per se rule that anytime an Acceptable Medical Source (AMS) opines a claimant has a medically determinable impairment that impacts her basic work activities, the de minim[i]s Step 2 threshold for severity has been met, and the adjudicator must continue the sequential process to Step 4 or 5."  [ECF No. 42 at 5].  The Court declines to adopt this categorical rule, which, as the Commissioner points out, would contravene regulations promulgated by the Commissioner, including that "a medical opinion alone cannot establish a medically determinable impairment, let alone a severe one," [ECF No. 43 at 2 (citing 20 C.F.R. § 404.1521)], and that an ALJ "will not defer or give

Commissioner's decision is <u>REVERSED</u>, and the case will be <u>REMANDED</u> for further proceedings consistent with this Order.  The Court fully recognizes that further review might result in the same outcome.  Nevertheless, the Court finds additional effort is appropriate to ensure that Mr. Laliberte has received the fulsome consideration contemplated by the statute where the issue of the severity of his impairments is not entirely clear.

**SO ORDERED.**

March 17, 2023                                                                  /s/ Allison D. Burroughs
                                                                                       ALLISON D. BURROUGHS
                                                                                       U.S. DISTRICT JUDGE

---

any specific evidentiary weight, including controlling weight, to any medical opinion(s) . . . , including those from [the claimant's] medical sources[,]" [<u>id.</u> at 3 (alteration and omission in original) (citing 20 C.F.R. § 404.1520c(a))].